1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE
9

10   AVENTA LEARNING, INC., et al.,          CASE NO. C10-1022JLR

11                  Plaintiffs,              ORDER ON MOTIONS FOR
                                             SUMMARY JUDGMENT, FOR
12          v.                               DISMISSAL OF
                                             COUNTERCLAIMS, AND FOR
13   K12, INC., et al.,                      PROTECTIVE ORDER

14                  Defendants.

15                       I.      INTRODUCTION

16          Before the court are three motions:  (1) Plaintiffs Micheal J. Axtman and James J.

17   Benitez's motion to dismiss Defendant KC Distance Learning, Inc.'s ("KCDL")

18   counterclaims (Dkt. # 58); (2) Defendants K12, Inc. ("K12"), Kayleigh Sub Two LLC,

19   and KCDL's motion for a protective order (Dkt. # 61); and (3) KCDL's motion for

20   summary judgment (Dkt. # 81).  K12, Inc. and Kayleigh Sub Two LLC have joined in

21   KCDL's motion for summary judgment.  (Joinder (Dkt. # 84).)  Having reviewed the

22   motions, and all materials filed in support and opposition thereto, and having heard the

oral argument of counsel concerning the motion for summary judgment and the motion to

dismiss on November 3, 2011,[1] the court GRANTS IN PART and DENIES IN PART

KCDL's motion for summary judgment, DENIES Mr. Axtman and Mr. Benitez's motion

to dismiss KCDL's counterclaims,[2] and GRANTS Defendants' motion for a protective

order.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

**A.  Background Related to Defendants' Motion for Summary Judgment**

Plaintiff Aventa Learning, Inc. ("Aventa") is a Washington corporation founded in

2002 by Mr. Axtman and Mr. Benitez.  (Am. Compl. (Dkt. # 26) ¶¶ 1, 4, 9.)  Aventa

assists schools in bringing their educational curricula online.  (*Id.* ¶ 4.)  The individual

plaintiffs, Mr. Axtman, Mr. Benitez, Dr. Ronald P. Benitz, Elizabeth A. Benitez, Robert

E. Harbison, and Susanne M. Harbison are the sole shareholders in Aventa.  (*Id.* ¶ 5.)

Mr. Axtman and Mr. Benitez remain the president and secretary of Aventa,

respectively.  (Knowles Decl. (Dkt. # 82) Ex. C (Axtman Dep.) at 7:10-77:24.)  Prior to

cofounding Aventa, Mr. Benitez was employed as a corporate finance analyst at an

investment banking firm.  (*Id.* Ex. B (Benitez Dep.) at 207:1-5, 207:25-208:2.)  In

addition, both men were previously employed at Apex Learning, which is an online

---

[1] No party requested oral argument or a hearing with regard to Defendants' motion for a protective order, and the court deems the declarations and other papers submitted by the parties to be sufficient for purposes of its ruling.

[2] On November 2, 2011, Defendants voluntarily dismissed counterclaims four and five for breach of the duty of loyalty and for misrepresentation, respectively.  (Dkt. # 100.) Accordingly, the court denies Plaintiffs' motion to dismiss these two counterclaims as moot.

education company. (*Id.* Ex. B (Benitez Dep.) at 212:16-213:9; Ex. C (Axtman Dep.) at 20:10-18.) At Apex, Mr. Axtman was responsible for creating business projections. (*Id.* Ex. C. at 20:10-18.)

KCDL is a provider of distance learning programs. Pursuant to an Asset Purchase Agreement ("APA"), dated January 10, 2007, KCDL acquired substantially all of the assets of Aventa. (Knowles Decl. Ex. M.) Knowledge Learning Corporation ("KLC") acquired KCDL as part of a larger acquisition of another company. (*Id.* Ex. A ("Brown Dep.") at 20:7-21:10.) After the acquisition, KLC hired Stephen Brown as the Chief Executive Officer of KCDL with the intent to expand KCDL. (*Id.*) In the fall of 2006, Mr. Brown began negotiating with Mr. Axtman and Mr. Benitez regarding the acquisition of Aventa by KCDL. (*See id.* Ex. H.)

KCDL regularly developed five-year financial projection models as part of its annual budgeting process. (*Id.* Ex. D. (Solis Dep.) at 68:15-24, 71:20-72:10.) The models include projections of revenues by business line, costs, expenses, net income, gross margin, and Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") for each of the five subsequent fiscal years. (*See id.* Ex. L at KCDL011986.) On October 19, 2006, Mr. Brown responded by email to Aventa's request for KCDL's EBITDA projections, stating that KCDL projected 2009 EBITDA of $16 million and 2011 of $37 million. (*Id.* Ex. I at KCDL001348.) These projections were taken from an August 2006 EBITDA model that reflected an assumption that KCDL would acquire Aventa ("the August 2006 Buy Model"). (*Id.* Ex. A ("Brown Dep.") at 70:18-71:6, 71:10-16; Ex. F at KCDL014499; Ex. G at KCDL034319.)

On November 30, 2006, Mr. Brown emailed Mr. Axtman and Mr. Benitez two five-year models dated October 20, 2006, one reflecting financial projections assuming that KCDL would acquire Aventa'a assets (the "October 2006 Buy Model"), and another reflecting financial projections assuming that KCDL would not. (*Id.* Ex. L.) The October Buy Model contained revenue projections for each of KCDL's lines of business by year from 2007 through 2011 and projected total EBITDA for that period to be $86 million. (*Id.* at KCDL011986.) While the August 2006 Buy Model projected EBITDA for 2009 and 2011 to be $16 million and $37 million, respectively, the October 2006 Buy Model projected EBITDA for 2009 and 2011 to be $12 million and $41 million, respectively. (Knowles Decl. Ex. I at KCDL001348; Ex. L at KCDL011986.) Nevertheless, Mr. Brown told Mr. Axtman that the numbers changed only because Mr. Brown had incorporated the new Aventa numbers (which Mr. Axtman and Mr. Benitez had previously provided) into the October 2006 Buy Model. (*See* Goldfarb Decl. (Dkt. # 86) Ex. F (Axtman Dep.) at 139:18-143:11.)

On January 10, 2007, KCDL, Aventa and the individual Plaintiffs executed the APA. (*Id.* Ex. N.) The APA provides consideration to Aventa for the sale of its assets to KCDL, as follows: (1) $2.34 million at closing; (2) the "Aventa Earnout," worth up to $3.3 million, based primarily on the 2007 performance of Aventa's assets; and (3) the "Additional Earnout," a future payment equal to "six percent (6%) of the Assumed Equity Value" of KCDL at a certain future point. (*Id.* at KCDL115629-34; Axtman Decl. (Dkt. # 87) Ex. H (APA) § 2.03(c)(i).) The Assumed Equity Value for calculating the Additional Earnout was to be derived by taking KCDL's trailing 12-month period

EBITDA and applying a multiplier that increased based on the number of years that Mr.

Axtman and Mr. Benitez served as senior executives of KCDL after the transaction.

(Knowles Decl. Ex. N at PLTF000051-53.)

Aventa received $2.34 million at closing and $3.3 million pursuant to the Aventa

Earnout in 2008. (Knowles Decl. Ex. C (Axtman Dep.) at 166:16-18, 167:9-15; Ex. B

(Benitez Dep.) at 147:23-148:3, 148:13-149:4.) KCDL has place an additional $1.7

million in escrow, representing its calculation of the Additional Earnout, pending

resolution of this lawsuit. (Knowles Decl. ¶¶ 23, 25.) Further, in connection with the

APA, or about January 12, 2007, Mr. Axtman and Mr. Benitez each executed an

employment agreement with KCDL. (Answer (Dkt. # 55) ¶ 13.)

On February 15, 2007, Mr. Axtman and Mr. Benitez received an updated 5-year

model dated February 9, 2007 ("the February 2007 Model"). (Knowles Decl. Exs. O, P;

C (Axtman Dep.) 181:16-25; Ex. B (Benitez Dep.) 153:4-16.) In this model, KCDL's

total projected EBITDA for the five-year period from 2007 through 2011 was $45 million

(Knowles Decl. Ex. P at KCDL020018-9), which was significantly less than the $86

million projected EBITDA total for the same period reflected in the October 2006 Buy

Model (*id.* Ex. L at KCDL011986).

Shortly after receiving the February 2007 Model, Mr. Axtman testifies that he

spoke with Mr. Brown who reassured him that the numbers in the February 2007 Model

were artificially low, and that the accurate model was still the "October 2006 Buy

Model." (Goldfarb Decl. (Dkt. # 86) Ex. F (Axtman Decl.) at 184:5-189:8.) Mr. Axtman

also passed Mr. Brown's reassurances onto Mr. Benitez. (*Id.* at 185:19-23; *see also*

Axtman Decl. Ex. F at KCDL019950 (describing February 2007 Model to Mr. Benitez as "a sandbag.")

As contemplated in the APA, immediately after the asset purchase closed, Mr. Axtman and Mr. Benitez joined KCDL as Vice Presidents in charge of KCDL's Aventa Learning business line. (Knowles Decl. Ex. C (Axtman Dep.) 170:11-24; Ex. B. (Benitez Dep.) 150:24-151:1.) Mr. Axtman and Mr. Benitez immediately became members of the senior executive team and participated in weekly senior staff meetings with Mr. Brown and other senior executives. (*Id.* Ex. C (Axtman Dep. at 171:1-20); Ex. B. (Benitez Dep.) at 151:2-19; Ex. A. (Brown Dep.) at 262:8-263:12.) Mr. Axtman and Mr. Benitez also became involved in other aspects of KCDL's business. They prepared financial projections and 5-year models and participated in KCDL's budgeting process. (*Id.* Ex. A (Brown Dep.) 263:13-264:3, 265:23-266:7, 268:16-24; Ex. Q; Ex. C (Axtman Dep.) 195:1-196:14; Ex. B (Benitez Dep.) at 179:12-180:6, 187:11-21; Ex. D (Solis Dep.) 245:20-246:10.) In October 2008, Mr. Axtman joined KCDL's Board of Directors. (*Id.* Ex. C (Axtman Dep.) 205:8-25.) In early 2009, Mr. Axtman became the head of the iQ Academies business line at KCDL. (*Id.*)

On July 26, 2010, K12 announced that it had purchased KCDL. (Am. Compl. ¶ 39.) The sale of KCDL constituted a "change of control" transaction under the APA allowing KCDL to elect to pay the Additional Earnout. (Knowles Decl. ¶ 23; Ex. M at KCDL115633.) Aventa disputed KCDL's calculation and demanded access to KCDL's books, records, and facilities. (*Id.* ¶ 24.) On January 19, 2011, KCDL paid $1.7 million as the Additional Earnout payment into an escrow account pending resolution of this

1  lawsuit.  (*Id.* ¶¶ 23, 25.)  On March 14, 2011, KCDL provided Aventa with its response

2  to the dispute, as well as approximately 50,000 pages of records.  (*Id.* ¶ 26.)

3      Plaintiffs initiated this lawsuit on June 2, 2010.  Plaintiffs allege violation of the

4  Washington State Securities Act ("WSSA"), RCW 21.20 *et seq.* (Am. Compl. ¶¶ 43-50),

5  the tort of misrepresentation (*id.* ¶¶ 51-60), breach of the implied covenant of good faith

6  and fair dealing (*id.* ¶¶ 61-66), a claim for declaratory relief (*id.* ¶¶ 67-69), and

7  entitlement to equitable relief such as a constructive trust over Aventa's assets, an

8  injunction, or an accounting (*id.* ¶¶ 70-74).  Defendants have moved for summary

9  judgment with regard to all of Plaintiffs' claims.  (SJ Mot. (Dkt. # 81).)

10  **B.  Background Related to Motion to Dismiss**

11      In their answer to Plaintiffs' amended complaint, Defendants assert counterclaims

12  against Mr. Axtman and Mr. Benitez.  (KCDL Answer (Dkt. # 55) at 13-22, ¶¶ 1-69

13  (Counterclaims).)  Defendants' allegations arise in connection with the employment

14  agreements executed by Mr. Axtman and Mr. Benitez, and their eventual separation from

15  KCDL.  (*Id.* ¶¶ 13-26.)  Defendants allege that the employment agreements at issue

16  contained loyalty, non-compete, and non-interference clauses.  (*Id.* ¶¶ 14-17.)

17  Defendants also allege that the employment agreements required Mr. Axtman and Mr.

18  Benitez to return all property, records, and other files at the end of their employment that

19  Mr. Axtman or Mr. Benitez had prepared for or received from KCDL during their

20  employment.  (*Id.* ¶ 18.)  In addition to his employment agreement, Defendants allege

21  that Mr. Axtman executed a separation agreement with KCDL and KCL.  (*Id.* ¶¶ 19-22.)

22

1    Defendants allege that, prior to and following his separation from KCDL, Mr.

2    Axtman formed and promoted a new company to compete with KCDL, that Mr. Axtman

3    interfered with KCDL's clients, and that he improperly accessed proprietary information

4    belonging to KCDL. (*Id.* ¶¶ 23-26.) They also allege the Mr. Benitez improperly

5    accessed KCDL's proprietary information. (*Id.* ¶ 26.)

6    Based on these factual allegations, Defendants assert six counterclaims.

7    Defendants assert that both Mr. Axtman and Mr. Benitez breached their employment

8    agreements with KCDL. (*Id.* ¶¶ 27-34, 40-45.) They assert that Mr. Axtman breached

9    his separation agreement with KCDL by copying, deleting, and destroying records and

10   proprietary information that were on the KCDL laptop that was in his possession

11   following the termination of his work relationship with KCDL. (*Id.* ¶¶ 35-39.) They also

12   allege that both Mr. Axtman and Mr. Benitez breached their duty of loyalty to KCDL (*id.*

13   ¶¶ 46-54), committed the tort of misrepresentation (*id.* ¶¶ 55-63), and converted KCDL's

14   property by accessing, copying, downloading, deleting or erasing KCDL's electronic

15   records following the termination of their employment (*id.* ¶¶ 64-69). Plaintiffs have

16   moved to dismiss each of these counterclaims. (Mot. to Dismiss (Dkt. # 58).)

17   **C.  Background Related to Motion for Protective Order**

18   As a part of the APA, both Mr. Axtman and Mr. Benitez signed employment

19   agreements with KCDL. (KCDL Answer at 14, ¶ 13 (Counterclaims).)[3] KCDL

20

21   _____

22   [3] Defendants now assert that "[Mr.] Benitez and [Mr.] Axtman were employed by KLC and assigned to KCDL." (Mot. for P.O. (Dkt. # 61) at 2 (citing 1st Keegan Decl. (Dkt. # 63) ¶ 2).) Both Mr. Benitez and Mr. Axtman deny that they were ever employed by KLC, and insist

subsequently issued both men laptop computers.  (Axtman Decl. re: P.O. (Dkt. # 68) ¶ 6; Benitez Decl. re: P.O. (Dkt. # 69) ¶ 6.)  Both men transferred privileged attorney-client communications that had been created prior to their employment with KCDL onto their new laptop computers.  (*See* Axtman Decl. re: P.O. ¶¶ 3-4, 8-9; Benitez Decl. re: P.O. 3-4, 8-9.)  Both men have testified that they stored these files locally on their laptops, and did not believe that their local files were transferred to KCDL's or KLC's servers.[4] (Axtman Decl. re: P.O. ¶ 12; Benitez Decl. re: P.O. ¶ 12.)  Both men also continued to produce attorney-client privileged communications in the form of emails on their work laptops after execution of the APA and the commencement of their employment at KCDL.  (*Id.*)

KLC performs the human resources function for KDLC.[5]  (1st Keegan Decl. (Dkt. # 63) ¶ 2.)  This function includes administration of all benefits, employer relations, and

that they were only employed by KLC's subsidiary KCDL.  (Axtman Decl. re: P.O. (Dkt. # 68) ¶5; Benitez Decl. re: P.O. (Dkt. # 69) ¶ 5; *see generally* Surreply (Dkt. # 74).)  Indeed, Mr. Axtman and Mr. Benitez have moved (as part of their sur-reply) to strike portions of Defendants' reply that that asserts that Mr. Axtman's and Mr Benitez's employment agreements with KCDL did not accurately reflect their employer or relationship with KCDL.  (Sur-reply at 2.)  The court, however, does not believe that the dispute is material for purposes of this motion, because it is undisputed that "KLC performed the complete human resources function for KCDL, including administration of all benefits, employee relations, and policy promulgation."  (1st Keegan Decl. (Dkt. # 63) ¶ 2.)

[4] Despite this belief, some of these materials were in fact transferred at some point onto Defendants' servers.  (*See* P.O. Mot. (Dkt. # 61) at 1; P.O. Reply (Dkt. # 70) at 4.)

[5] Although Mr Axtman and Mr. Benitez both deny that they were ever employed by KLC, neither has disputed that KLC performed the human services function for KDLC during the period of their employment, including the promulgation of company policies.

policy promulgation. (*Id.*) KLC also provides technology services for KCDL, including email. (*Id.*)

KLC has an Employee Handbook governing it and its subsidiaries and affiliates that contains an Electronic Communications Policy that provides, in part:

> All resources used for electronic communications are KLC property and should generally be used only for KLC business.
>
> * * *
>
> Electronic communications are not private. KLC reserves the right to access, search, inspect, monitor, record, and disclose any file or stored communication, with or without notice to the employee, at any time for any reason to ensure that such communications are being used for legitimate business reasons. Deleted e-mail messages may also be restored from the system.

(1st Keegan Decl. ¶ 3, Ex. 2 at 21.)[6] KLC regularly enforces this policy. (*Id.* ¶ 5.) Employees' laptops have been reviewed by the company, and employees have been disciplined, including having their employment terminated, for violations. (*Id.*)

---

[6]KLC also has a second, more detailed, policy entitled the Electronic Communications and Computer Usage Policy. (1st Keegan Decl. ¶ 4, Ex. 3.) This policy is set forth on KLC's intranet site, which is known as KLCentral. (2nd Keegan Decl. (Dkt. # 72) ¶ 4.) Defendants provided testimony that Mr. Benitez and Mr. Axtman had access and were granted logins to KLCentral, and as senior managers were expected to know the contents of company policies that were set forth on KLCentral. (*Id.* ¶¶ 4-5.) Nevertheless, both Mr. Axtman and Mr. Benitez testified that they did not use or access KLCentral, and were not aware of and did not review the Electronic Communications and Computer Usage Policy on KLCentral. (Axtman Decl. re: P.O. ¶ 14; Benitez Decl. re P.O. ¶ 14.) In addition, Mr. Benitez testified that he "do[es] not believe [he] was even provided a username and password to access KLCentral." (*Id.*) As a result of this factual dispute concerning Mr. Benitez's ability to even access KLCentral, the court does not consider the Electronic Communications and Computer Usage Policy in its analysis of the privilege issues, but rather confines its analysis to the Electronic Communications Policy contained within the company handbook.

Defendants have produced testimony that it is the pattern and practice of KLC to provide all employees, including those assigned to its affiliates and subsidiaries, with copies of the Employee Handbook upon hiring, and that (in accord with this policy and practice) Mr. Axtman and Mr. Benitez would have received this Handbook upon the commencement of their employment. (*Id.* ¶ 6; *see also* 2nd Keegan Decl. (Dkt. # 72) ¶ 3.)

Mr. Axtman and Mr. Benitez, however, have both testified that to the best of their knowledge they never received copies of KLC's employee handbook, and were not aware of KLC's policies prior to their transfer of privileged files onto their KCDL laptops. (Axtman Decl. re: P.O. ¶ 13; Benitez Decl. re: P.O. ¶ 13.) In addition, Defendants have not produced copies of "Employee Acknowledgements" signed by either Mr. Axtman or Mr. Benitez concerning their receipt of KLC's policies or its handbook.

Nevertheless, Defendants have produced a copy of a template letter from Mr. Brown that was sent to all Aventa Employees who were being retained by KCDL following execution of the APA by Aventa and KCDL. (*See* 1st Keegan Decl. ¶ 6, Ex. 4.) The letter specifically instructs the new KCDL employees from Aventa to review the employee handbook. (*Id.* Ex. 4 at 2.) Neither Mr. Axtman nor Mr. Benitez specifically deny receiving a copy of this letter. (*See generally* Benitez Decl. & Axtman Decl.) Further, the letter directs the new employees to contact Mr. Axtman with any questions concerning the transition. (*Id.* Ex. 4 at 3.)

Despite Mr. Axtman's and Mr. Benitez's inability to specifically recall receiving a copy of the KLC Handbook (*see* Axtman Decl. re: P.O. ¶ 13; Benitez Decl. re: P.O. ¶

13), there can be no doubt that Mr. Benitez received a copy by at least November 19, 2007, and that both men received a copy by February 23, 2009.  Defendants have produced a copy of a November 19, 2007 email to a new hire at KCDL, on which Mr. Benitez was copied, and which attaches a copy of the KLC Handbook.  (2nd Keegan Decl. Ex. 1.)  The email describes the KLC Handbook as the employee handbook, and specifically asks the new KCDL hire to review it with regard to company policies.  (*Id.*)  Mr. Benitez does not specifically deny receiving this email.  (*See generally* Benitez Decl.)  Further, Defendants have produced a copy of a February 23, 2009 email addressed to both Mr. Axtman and Mr. Benitez, which also attaches the KLC Handbook.  (2nd Keegan Decl. Ex. 2.)  Neither Mr. Axtman nor Mr. Benitez has specifically denied receiving this email.  (*See generally* Axtman Decl. & Benitez Decl.)

After his employment with KCDL ended, Mr. Axtman returned his laptop to the company in late 2009.  He did not, however, make a claim with regard to any privileged documents contained on his laptop until May 12, 2011, nearly a year and half after he relinquished the laptop to the company.  (Crooks Decl. (Dkt # 62) ¶¶ 7-8, Ex. 5.)

Mr. Benitez was terminated on September 28, 2010, but initially refused to return his company laptop.  He asserted that he had saved years worth of privileged communications on his laptop.  Counsel for Defendants asserted that Mr. Benitez had no expectation of privacy with regard to contents on the laptop, and insisted that he return it because it was company property.  (Crooks Decl. Ex. 1.)  Mr. Benitez ultimately returned the laptop on January 21, 2011 (*id.* ¶ 3), but only after Defendants had agreed to a

"review protocol" that would require Defendants to sequester the asserted privileged material prior to reviewing the remainder of the laptop's contents (*id.* Ex. 2).

The emails or other documents at issue in this motion include asserted privileged communications (1) from before execution of the APA in January 2007, which Mr. Benitez and Mr. Axtman saved on their KCDL laptops in a folder in Microsoft Outlook (which was a program provided by the company), (2) from Mr. Axtman's and Mr. Benitez's web-based personal email accounts, which they saved and imported into Microsoft outlook on their KCDL laptops, and (3) from Mr. Axtman's and Mr. Benitez's post-acquisition work email accounts, which they saved in Microsoft Outlook on their KCDL laptops. In addition, Plaintiffs assert that some of these privileged materials may be residing on Defendants' computers and servers. Defendants seek a protective order from the court declaring that these documents are not privileged and/or that the privilege has been waived.

### III.    ANALYSIS

#### A.  Motion for Summary Judgment

##### 1.  Standards

Defendants have moved for summary judgment of all claims against them in Plaintiffs' amended complaint. (*See* SJ Mot.) Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The

1 moving party bears the initial burden of showing there is no genuine issue of material fact

2 and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If

3 the moving party meets his or her burden, then the non-moving party "must make a

4 showing sufficient to establish a genuine dispute of material fact regarding the existence

5 of the essential elements of his case that he must prove at trial" in order to withstand

6 summary judgment. *Galen*, 477 F.3d at 658.

### 2. Statute of Limitations

8 Defendants assert that the three-year statute of limitations has run with regard to

9 Plaintiffs' WSSA and misrepresentation claims. They argue that Plaintiffs' claims under

10 the WSSA and for misrepresentation are based on their allegations that the financial

11 projections and EBITDA calculations contained in the October 2006 Buy Model were

12 false or misleading. They further assert, however, that Mr. Axtman and Mr. Benitez had

13 notice of their claims no later than February 2007, and therefore, Plaintiffs' claims, which

14 were filed in June 2010, are time-barred.

15 There is no dispute that Mr. Axtman and Mr. Benitez received three sets of

16 financial projections between October 2006 and February 2007 – all of which are

17 dramatically different from one another. Defendants assert that the receipt of these

18 varying financial projections and EBITDA calculations placed Plaintiffs on notice that

19 the October 2006 Buy Model was false or misleading. The statute of limitations for a

20 WSSA claim is three years from the date on which the violation was or could have been

21 discovered in the exercise of reasonable care. RCW 21.20.430(4)(b). In addition, causes

22 of action for misrepresentation must be brought within three years and accrue when the

aggrieved party has discovered the facts constituting misrepresentation.  *See* RCW

4.16.080(4) (three-year statute of limitations for fraud); *Young v. Savidge,* 230 P.3d 222,

230 (Wash. Ct. App. 2010) (applying statute of limitations from RCW 4.16.080(4) to

claims for misrepresentation).

A cause of action accrues when the plaintiff knew or should have known all the

facts underlying the essential elements of the action.  *Reichelt v. Johns-Manville Corp*.,

733 P.2d 530, 534 (Wash. 1987); *1000 Virginia Ltd. Partnership v. Vertecs Corp.,* 146

P.3d 423, 428 (Wash. 2006).  In Washington, the general rule is that when a plaintiff is

placed on notice by some appreciable harm occasioned by another's wrongful conduct,

the plaintiff must make further diligent inquiry to ascertain the scope of the actual harm.

*Green v. A.P.C.*, 960 P.2d 912, 916 (Wash. 1998).  It is not necessary for the plaintiff to

be aware that he has a legal cause of action.  *Reichelt*, 733 P.2d at 534-35.  But an injured

plaintiff who reasonably suspects that a specific wrongful act has occurred is on notice

that legal action must be taken.  *Id.* at 534.  The plaintiff is charged with what a

reasonable inquiry would have discovered.  *Green*, 960 P.2d at 916.

Washington, however, allows equitable tolling of the statute of limitations when

justice requires.  *Thompson v. Wilson,* 175 P.3d 1149, 1154 (Wash. Ct. App. 2008); *see*

*also Stueckle v. Sceva Steel Buildings, Inc.,* 461 P.2d 555, 557 (Wash. Ct. App. 1970)

("The statute of limitations may be tolled by the concealment of material facts,

misrepresentation, or a promise to pay in the future.").  "Equitable tolling is permitted

where there is evidence of bad faith, deception or false assurances by the defendant and

the exercise of diligence by the plaintiff."  *Thompson,* 175 P.3d at 1154; D. DeWolf, K.

1   Allen & D. Caruso, 25 Wash. Prac. § 16.19 (2010) ("Washington recognizes an equitable

2   tolling principle. . . .").

3         Plaintiffs assert that after receiving the October 2006 Buy Model, Mr. Brown

4   reassured them that the differences between the projections in this model and the

5   projections in the August 2006 Buy Model were due to the inclusion of the new Aventa

6   numbers into the October 2006 Buy Model.  (*See* Goldfarb Decl. Ex. F (Axtman Dep.) at

7   139:18-143:11.)  Plaintiffs further contend that after receiving the February 2007 Model,

8   Mr. Brown again reassured them that the numbers in the February 2007 Model were

9   artificially low, and that the accurate model was still the October 2006 Buy Model.  (*Id.*

10  at 184:5-189:8.)  On this summary judgment motion, the court must view the evidence in

11  the light most favorable to Plaintiffs.  Applying this standard, and taking into account the

12  reassurances issued by Mr. Brown, the court cannot conclude that reasonable minds could

13  not differ as to the commencement of the running of the statute of limitation in February

14  2007 or the tolling of the statute by Mr. Brown's reassurances concerning the differences

15  in the various models Plaintiffs' received.  These are material issues of fact which must

16  be reserved for the jury.  Accordingly, the court denies Defendants' motion for summary

17  judgment with regard to the statute of limitations.

18        **3.  Plaintiffs' WSSA Claim**

19        Defendants contend that neither the sale of Aventa's assets to KCDL nor the

20  Additional Earnout under the APA constitute a security under Washington law, and

21  therefore, Plaintiffs' WSSA claim must fail.  (SJ Mot. at 12-18.)  Although the court

22  previously rejected Defendants' argument in this regard in the context of their motion to

dismiss (*see* Order (Dkt. # 54) at 11-18), Defendants have raised the issue again here on summary judgment.

There are two essential elements to a WSSA claim: "(1) a fraudulent or deceitful act committed (2) in 'connection with the offer, sale or purchase of any security.'" *Kinney v. Cook,* 154 P.3d 206, 209-10 (Wash. 2007) (quoting RCW 21.20.010).[7] It is the second prong of this test that is once again at the heart of the present dispute.

WSSA broadly defines a "security," in pertinent part, as follows:

> "Security" means any . . . stock; . . . investment contract; investment of money or other consideration in the risk capital of a venture with the expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture; . . . or, in general, any interest or instrument commonly known as a "security". . . .

RCW 21.20.005(12)(a). "[T]he definition of security 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *Cellular Eng'g,* 820 P.2d at 946 (quoting *SEC v. W.J. Howey,* 328 U.S. 293,

---

[7]It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

(1) To employ any device, scheme, or artifice to defraud;

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

RCW 21.20.010.

299 (1946)).  However, "[t]he essential attribute of a security is an investment 'premised

on a reasonable expectation of profits to be derived from the entrepreneurial or

managerial efforts of others.'"  *Firth v. Lu,* 12 P.3d 618, 623 (Wash. Ct. App. 2000)

(quoting *United Housing Found. v. Forman*, 421 U.S. 837, 852 (1975)).

Whether or not an investment scheme or contract constitutes a security is a

question of law.  *Swartz v. Deutsche Bank*, No. C03–1252MJP, 2008 WL 1968948, at

*22 (W.D. Wash. May 2, 2008) (citing *De Luz Ranchos Inv. Ltd. v. Coldwell Banker &

Co.,* 608 F.2d 1297, 1299–1301 (9th Cir. 1979)); *see also Haberman v. Washington Pub.

Power Supply Sys.,* 744 P.2d 1032, 1047 (Wash. 1987) ("[W]e note that federal courts

consistently determine as a matter of law whether investment schemes are securities.")

(citing cases).[8]  In determining whether a transaction constitutes the sale of a security,

the court should consider substance over form, consistent with the purpose of the act to

protect the investing public.  *Cellular Eng'g,* 820 P.2d at 946.

Defendants assert that the issue of whether the APA or the Additional Earnout is a

security should be analyzed under the test for an "investment contract" as stated in

*Howey,* 328 U.S. at 301.  (SJ Mot. at 13.)  Washington courts apply a modified *Howey*

test which defines an "investment contract" security as "(1) an investment of money (2)

in a common enterprise and (3) the efforts of the promoter or a third party must have

---

[8] ". . . Washington courts have looked to federal law in determining whether a transaction involves a 'security.'"  *Shinn v. Thrust IV, Inc.,* 786 P.2d 285, 298 (Wash. Ct. App. 1990) (citing *State v. Philips,* 741 P.2d 24, 28 (Wash. 1987)); *see also* RCW 21.20.900 (policy of the WSSA is to make uniform the law and to coordinate its interpretations and administration with related federal regulation).

been fundamentally significant ones that affected the investment's success or failure." *Ito Int'l Corp. v. Prescott, Inc.,* 921 P.2d 566, 571-72 (Wash. Ct. App. 1996); *see also Cellular Eng'g,* 820 P.2d at 946. The third prong of the modified *Howey* test looks to whether the profits on an enterprise "come 'primarily' or 'substantially' from the efforts of others." *Id.* at 946 (citing *Sec. & Exch. Comm'n v. Glenn W. Turner Enters., Inc.,* 474 F.2d 476, 482 (9th Cir. 1973)). Defendants assert that Plaintiffs fail to satisfy the third element of this test.

Although Plaintiffs defend their position that the Additional Earnout is a security under the "investment contract" analysis (*see* SJ Resp. (Dkt. # 85) at 12-17), they also argue that the Additional Earnout constitutes a security under the "risk capital" formulation that is also contained within the statutory definition (*see id.* at 11-12 (citing RCW 21.20.005(12)(a))).[9] "A risk capital investment may arise 'where the investor does not receive the right to exercise practical and actual control over the managerial decisions

---

[9] Plaintiffs also assert that the Additional Earnout constitutes a security because certain federal regulations and courts treat "phantom stock" or a stock appreciation right ("SAR") as a security, and prior to the execution of the APA, Mr. Axtman and Mr. Benitez were promised a "phantom equity interest" in KCDL and certain KCDL officers characterized the transaction as providing Plaintiffs with "phantom stock," "a phantom SAR plan," or "phantom equity" in KCDL. (*See* SJ Resp. at 9-11.) Nowhere does the APA itself refer to "phantom stock," "phantom equity," or "phantom SARs." In deciding whether a security is at issue here, the court must look to the substance or realities of the transaction. *Suave v. K.C., Inc.,* 591 P.2d 1207, 1208 (Wash. Ct. App. 1979) ("In determining whether a given transaction constitutes a 'security' within the meaning of these statutes, form should be disregarded for substance, and the emphasis should be on economic reality.") Accordingly, the court is less concerned with the informal nomenclature used by various parties either before or after the transaction, and more concerned with the actual terms of the APA. Further, Plaintiffs have failed to provide one case in which a court has concluded that an asset purchase agreement, which includes the type of future cash earnout payment at issue here, constitutes the purchase of a security. Accordingly, the court concludes that the proper analysis is to consider the APA and its Additional Earnout under the modified *Howey* test or the "rick capital" formulation.

of the venture.'" *Ultimate Timing, LLC v. Simms,* No. C08-1632-MJP, 2010 WL 2650705, at *2 (W.D. Wash. June 29, 2010) (citing *Suave v. K.C., Inc.,* 591 P.2d 1207 (Wash. 1979) (applying an earlier version of RCW 21.20.005(12) that did not include "risk capital," but describing a risk capital investment as one "with a reasonable expectation of a valuable benefit but without the right to control the enterprise.")). Courts in Washington, while recognizing that "the risk capital definition is distinct from the definition of an investment contract," nevertheless "appear to combine their analyses of both concepts under the *Howey* definition." *Ultimate Timing,* 2010 WL 2650705, at *2 (citing *Ito Int'l,* 921 P.2d at 571). One court has declared: "Adoption of the 'risk capital' approach . . . does not obviate the *Howey* test that has heretofore been applied by the Washington courts." *State v. Phillips,* 725 P.2d 627, 630 (Wash. Ct. App. 1986).

A recent decision in the Western District of Washington, interpreting Washington law on this issue, is instructive. In *Ultimate Timing,* 2010 WL 2650705, plaintiff made an investment in an enterprise devoted to the commercialization and marketing of a race timing system in exchange for a 20% ownership and profit interest in the enterprise. *Id.* at *2. The plaintiff, however, conceded that he "spent substantial time and effort marketing the timing system to race directors and race timers during the time he was working with [the company]." *Id.* He also negotiated on behalf of the company. *See Ultimate Timing, LLC v. Simms,* 715 F. Supp. 2d 1195, 1209 (W.D. Wash. 2010). The *Ultimate Timing* court found that under either the "risk capital" or the "investment contract" analysis of "security," the plaintiff's own description of the investment required dismissal of the claim. *Ultimate Timing,* 2010 WL 2650705, at *2. The court found that

the plaintiff's "capital contribution was not an investment contract because [the

company's] profitability turned on [the plaintiff's] own ability to market the system to

timers and races." *Id.* The court also found that the plaintiff's capital contribution

"[l]ikewise . . . was not a 'risk capital investment' because [the plaintiff] exercised

practical or actual control over the entity." *Id.*

Like the result in *Ultimate Timing,* the result here is also the same under either the

"investment contract" or "risk capital" formulation. There is no dispute that immediately

following the execution of the APA, both Mr. Axtman and Mr. Benitez joined KCDL as

Vice Presidents in charge of KCDL's Aventa Learning business line. (*See* Knowles

Decl. Ex. C (Axtman Dep.) at 170:11-24l; Ex. B (Benitez Dep.) at 150:24-151:1.)

Indeed, Mr. Axtman's and Mr. Bentiez's employment agreements are attached as exhibits

to the APA and require that they become "Vice President[s], Sales" immediately after the

transaction. (Knowles Decl. Ex. N at PLTF000054.) In addition, there is no dispute that

Mr. Axtman and Mr. Benitez became members of KCDL's six-person executive team,

which was responsible for strategic and operational decisions with respect to all of

KCDL's business, immediately after the transaction closed in January 2007. (Knowles

Decl. Ex. A (Brown Dep.) at 262:18-263:12.)

Mr. Axtman and Mr. Benitez try to minimize these significant contributions by

asserting that they did not have the authority to hire and fire employees (SJ Resp. at 12),

although Mr. Benitez admitted that immediately after the transaction, he and Mr. Axtman

"could hire a sales team." (2nd Knowles Decl. (Dkt. # 93) Ex. B (Benitez Dep.) at 88:16-

89:10.) They also try to minimize their involvement by asserting that they traveled for

work extensively promoting sales or worked from home.  (SJ Resp. at 12.)  However,

both testified that they did in fact typically participate in weekly executive meetings –

albeit via telephone.  (2nd Knowles Decl. Ex. B (Benitez Dep.) at 151:12-19; Ex. C

(Axtman Dep.) at 171:1-20.)  In any event, in this day and age of almost ubiquitous

connectivity via cellular telephones and laptop computers, the court finds Mr. Axtman's

and Mr. Benitez's travel schedules or the location of their remote offices to be immaterial

with regard to the significance of their contributions to company management.   Indeed,

the court finds that the involvement of Mr. Benitez and Mr. Axtman to be at least as

significant, if not more so, than the plaintiff in *Ultimate Timing*.  Accordingly, the court

finds that neither the APA nor the Additional Earnout meets the definition of either an

investment contract or a risk capital investment, and accordingly is not a security under

the WSSA.  Defendants are entitled to summary judgment on Plaintiffs' WSSA claim,

and the court dismisses the claim.

### 4.  Plaintiffs' Misrepresentation Claim

"In order to prevail on a claim for intentional misrepresentation, [the plaintiff]

must show: '(1) representation of an existing fact, (2) materiality, (3) falsity, (4) the

speaker's knowledge of its falsity, (5) intent of the speaker that it should be acted upon

by the plaintiff, (6) plaintiff's ignorance of its falsity, (7) plaintiff's reliance on the truth

of the representation, (8) plaintiff's right to rely upon the representation, and (9) damages

suffered by the plaintiff.'"  *Poulsbo Group, LLC v. Talon Dev., LLC,* 229 P.3d 909-10

(Wash. Ct. App. 2010) (quoting *W. Coast, Inc. v. Snohomish Cnty.*, 48 P.3d 997, 1000

(Wash. Ct. App. 2002)).  A material misrepresentation is one to which a reasonable

person would attach importance when determining whether to participate in a transaction. *Aspelund v. Olerich,* 784 P.2d 179, 183 (Wash. Ct. App. 1990). "Each element must be established by 'clear, cogent and convincing evidence.'" *Id.* (quoting *Stiley v. Block*, 130 Wash.2d 486, 505, 925 P.2d 194, 200 (Wash. 1996)). Defendants assert that Plaintiffs have failed to prove by the necessary evidentiary standard (1) the existence of a material false representation, and (2) their right to rely upon it. (SJ Mot. at 18-21.)

Plaintiffs' misrepresentation claim arises out of Defendants' presentation to them of certain models (such as the October 2006 Buy Model, and others described above) projecting the performance of KCDL following its acquisition of Aventa. The heart of Plaintiffs' misrepresentation claim is the allegation that Defendants presented the October 2006 Buy Model as a good-faith estimate of KCDL's EBITDA, when in fact it was not generated in good faith. (Am. Compl. ¶ 33.) As noted above, the standard of proof for an intentional misrepresentation claim is high, and may prove to be a hurdle too high for Plaintiffs to clear at trial. The court, nevertheless, finds that given the disputed nature of the testimony concerning the methods used to develop the various models received by Mr. Axtman and Mr. Benitez both before and after execution of the APA, conflicting testimony concerning the rigor underpinning these models and their reliability or lack thereof, as well as Defendants' and other witnesses' various statements to Plaintiffs about these models, Plaintiffs have raised sufficient material factual issues regarding the existence of a false representation to survive summary judgment.

With regard to the issue of Plaintiffs' right to rely upon the alleged misrepresentations, the court finds Plaintiffs have raised sufficient material factual issues

to survive summary judgment on this issue, as well.  The reliance issue is not, as

Defendants assert, whether Plaintiffs were entitled to rely on the projections as a

"guarantee of future performance" (SJ Mot. at 21) – clearly they were not.  Rather, the

issue is whether they were entitled to rely upon Defendants' representations about the

rigor of the analysis underpinning the models – for example, that the projections were

reasonable, based on fair assumptions or methodology, and supported by a significant

capital plan.

Further, contrary to Defendants' assertions, Plaintiffs were not required to make

further inquiry once Defendants had made representations or reassurances to Plaintiffs

concerning the rigor of the models.  "A party to whom a positive, distinct and definite

representation has been made is entitled to rely on that representation and need not make

further inquiry concerning the particular facts involved."  *Douglas Nw., Inc. v. Bill*

*O'Brien & Sons Constr., Inc.*, 828 P.2d 565, 577 (Wash. 1992); *see also ABN Amro*

*Mortg. V. Greene,* No. C04-0450C, 2005 WL 2207027, at * 3 (W.D. Wash. Aug. 10,

2005) (applying Washington law). This rule is applied if the misrepresentations are made

to induce conduct, the misrepresentations succeed in inducing conduct, and the

complaining party was actually deceived and mislead by the misrepresentations.  *Jenness*

*v. Moses Lake Dev. Co.*, 234 P.2d 865, 869 (Wash. 1951) (quoting *Cunningham v. Studio*

*Theatre, Inc*., 229 P.2d 890, 894 (Wash. 1951)). When applying this rule, "it is

immaterial that the means of knowledge are open to the complaining party, or easily

available to him, and that he may ascertain the truth by proper inquiry or investigation."

*Jenness*, 234 P.2d at 869 (quoting *Cunningham*, 229 P.2d at 894).  Accordingly, the court denies Defendants' motion for summary judgment on Plaintiffs' misrepresentation claim.

### 5.  Duty of Good Faith and Fair Dealing Claim

The implied duty of good faith and fair dealing "obligates parties [to a contract] to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank,* 807 P.2d 356, 360 (Wash. 1991).  The duty prevents a contracting party from engaging in conduct that frustrates the other party's right to the benefits of the contract.  *Woodworkers of Am. v. DAW Forest Prods. Co.,* 833 F.2d 789, 795 (9th Cir. 1987).  Plaintiffs' claim for breach of the duty of good faith and fair dealing is based on allegations that KCDL, through it management bonus plan and certain accounting methods, artificially suppressed EBITDA generation, which undermined and limited Plaintiffs' expected compensation under the Additional Earnout.[10]  (Am. Compl. ¶¶ 61-66.)

Although Defendants acknowledge that Washington courts recognize an implied duty of good faith and fair dealing in every contract, *see Betchard-Clayton, Inc. v. King,* 707 P.2d 1361, 1364 (Wash. Ct. App. 1985), they correctly assert that the duty of good faith and fair dealing "does not extend to obligate the party to accept a material change in the terms of its contract," nor "inject substantive terms into the parties' contract." *Badgett,* 807 P.2d at 360 (internal citations and quotation marks omitted).  Accordingly,

---

[10] "[T]he APA provides that the Additional Earnout is calculated based on a percentage of, 'equal to six percent (6%) of the Assumed Equity Value' of KCDL."  (Am. Compl. ¶ 18 (quoting APA § 2.03(c)).)  "Assumed Equity Value" is in turn based on KCDL's EBITDA.  (*Id.* ¶ 27; Knowles Decl. Ex. M (APA) § 203(c).)

they move to dismiss Plaintiffs' claim on summary judgment, arguing that no provision of the APA requires KCDL to maximize EBITDA. (SJ Mot. at 22.)

The issue, however, is not the injection of a substantive term into the APA, but rather whether KCDL exercised its discretion with regard to accounting methods and other factors affecting the calculation of EBITDA following execution of the APA in good faith. "The covenant of good faith applies when the contract gives one party discretionary authority to determine a contract term; it does not apply to *contradict* contract terms." *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.,* 935 P.2d 628, 632 (Wash. Ct. App. 1997) (italics in original). As stated by the court:

> The duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time. . . . The covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party. . . . However, it will not contradict terms or conditions for which a party has bargained.

*Id.* (quoting *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1995)); *see also Craig v. Pillsbury Non-Qualified Pension Plan,* 458 F.3d 748, 752 (8th Cir. 2006) ("Ordinary contract principles require that, where one party is granted discretion under the terms of the contract, that discretion must be exercised in good faith – a requirement that includes the duty to exercise the discretion reasonably.") (applying Washington law).

Under the APA, Plaintiffs' Additional Earnout was based, in part, on KCDL's calculation of its EBITDA. The determination of EBITDA is not an exact science, and can be affected by a range of accounting and other factors within Defendants' discretion. Plaintiffs presented evidence that following execution of the APA, KCDL implemented

1 certain accounting policy changes that suppressed its EBITDA calculation.  (*See*

2 Goldfarb Decl. Ex. P (Beaton Supp. Expert Report) ¶ 31(a)-(e).)  For example, certain

3 KCDL employees questioned the value received for shared services charged to KCDL by

4 KLC, which reduced EDITDA.  (*Id.* ¶ 31(e); Benitez Decl. Ex. E at KCDL086560;

5 Goldfarb Decl. Ex. S at 15.)  While Defendants submit evidence that KCDL revised its

6 bonus plan to incentivize the maximization of EBITDA (Cogan Decl. (Dkt. # 83)),[11] this

7 evidence does not negate the existence of a material issue of fact in light of the evidence

8 presented by Plaintiffs. Accordingly, the court denies Defendants' motion for summary

9 judgment on this issue.[12]

10 _____

11    [11] In their opposition to Defendants' motion for summary judgment, Plaintiffs move to
strike Mr. Cogan's declaration on grounds that KCDL did not disclose Mr. Cogan as an expert
12 witness in any of its Federal Rule of Civil Procedure 26(a) initial disclosures, even though
KCDL had supplemented those disclosures only one month prior to filing its motion for
13 summary judgment. (SJ Resp. at 23-24.)  Because the court has denied Defendants' motion for
summary judgment on this issue even in light of Mr. Cogan's declaration, Plaintiffs' request to
14 strike Mr. Cogan's declaration is moot.  Further, KCDL has stated that Plaintiffs were permitted
the opportunity to depose Mr. Cogan prior to filing their response to KCDL's motion for
15 summary judgment (SJ Reply (Dkt. # 92) at 12 n. 8 (citing 2nd Knowles Decl. ¶ 6)), and thus
prejudice, if any, would appear to be minimal.  In any event, the court's decision with regard to
16 Mr. Cogan's declaration here does not preclude Plaintiffs from raising the issue of the
admissibility of Mr. Cogan's testimony at trial in a motion in limine, if appropriate.

17    [12] The APA provides that, if KCDL and Aventa cannot resolve any dispute concerning
the calculation of the Additional Earnout payment, they shall submit the dispute to an
18 independent accounting firm for "final, binding and conclusive" resolution.  (Knowles Decl. Ex.
M at KCDL115634.)  In their motion for summary judgment, Defendants assert, in a one-
19 sentence argument, that the APA requires arbitration before an independent accounting firm
regarding any dispute over KCDL's calculation of the Additional Earnout.  (SJ Mot. at 22.)  In
20 addition, Defendants address the issue in one sentence and a footnote within their reply
memorandum.  (SJ Reply at 12 & n. 9.)  Likewise, Plaintiffs addressed the issue in three
21 sentences within a footnote of their responsive memorandum.  (SJ Resp. at 23, n. 4.)  The court
finds the parties' discussion of the issue wholly inadequate for purposes of any determination,
22 and declines to consider this issue based on the sparse "briefing" provided by the parties.  *See,
e.g., Indep. Towers of Wash. v. Wash.,* 350 F.3d 925, 929 (9th Cir. 2003) ("As the Seventh

### 6. Claim for Declaratory Relief

Defendants have moved for summary judgment of Plaintiffs' claim for declaratory relief.  Plaintiffs contend that they have been denied "reasonable access to KCDL's information and documents relating to EBITDA and the booking of transactions effecting EBITDA."  (Am. Compl. ¶ 68.)  Defendants assert that the claim should be dismissed on summary judgment because:

> . . . KCDL provided Aventa with financial and accounting information to permit it to investigate the basis for the dispute.  Aventa has received the information to which it is entitled pursuant to the APA.

(SJ Mot. at 23.)  Defendants assert this bald statement without a scintilla of factual support.  By way of contrast, Plaintiffs have submitted evidence of a continuing dispute concerning the adequacy of Defendants' production of documents and information as required under the APA relating to KCDL's calculation of EBITDA.  (SJ Resp. at 24 (citing Goldfarb Decl. Exs. T, U).)  The court, accordingly, denies Defendants' motion for summary judgment on this issue.

### 7. Individual Plaintiffs

Defendants assert that the claims of the individual plaintiffs – Aventa's shareholders – should be dismissed because the individual plaintiffs lack standing.  A plaintiff must have a personal stake in the outcome of the case to bring suit.  *Gustafson v. Gustafson,* 734 P.2d 949, 952 (Wash. Ct. App. 1987).  "Ordinarily, a shareholder cannot sue for wrongs done to a corporation, because the corporation is viewed as a separate

Circuit observed in its now familiar maxim, '[j]udges are not like pigs, hunting for truffles buried in briefs.'") (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991)).

entity, and the shareholder's interest is too remote to meet the standing requirements." *Id.* at 953. "Even a shareholder who owns all or most of the stock, but who suffers damages only indirectly as a shareholder, cannot sue as an individual." *Sabey v. Howard Johnson & Co.,* 5 P.3d 730, 735 (Wash. Ct. App. 2000). There are two exceptions to this rule: "(1) where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder; and (2) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders." *Id.* The special duty must have "its origin in circumstances independent of the stockholder's status as a stockholder." *Hunter v. Knight, Vale & Gregory,* 571 P.2d 212, 216 (Wash. Ct. App. 1977).

With regard to the first exception, Defendants assert that there is no evidence that they owed any special duty to the individual plaintiffs – independent of their status as stockholders of Aventa, and Plaintiffs have asserted none. (*See* SJ Resp. at 24.) With regard to the second exception, Defendants argue that although the individual plaintiffs signed the APA, they did so expressly in their capacity as shareholders of Aventa (Knowles Decl. Ex. M at KCDL115666-68), providing certain representations and warranties to KCDL (*see id.* at KCDL115636-48 (Articles III & IIIA)). Plaintiffs have not disputed these facts. Further, Plaintiffs have provided no evidence that the individual plaintiffs suffered any injury separate and distinct from those allegedly suffered by Aventa. The claims they assert are identical to those asserted by Aventa, and any injury they have allegedly incurred arises by virtue of their status as an Aventa shareholder.

Earlier in these proceedings, the court declined to dismiss the claims of the individual plaintiffs on Defendants' motion to dismiss. (Order (Dkt. # 54) at 9-10.) As

the court noted in its prior ruling, however, neither party had cited any authority for its position.  (*Id.* at 9.)  Further, the posture of the case and the standards guiding the court were obviously different in the context of Defendants' motion to dismiss.  The court now finds that Defendants have met their initial burden of showing that they are entitled to prevail on this issue as a matter of law, and Plaintiffs have failed to demonstrate a genuine issue of material fact in response.[13]  Accordingly, the court grants Defendants' motion for summary judgment dismissing the claims of the individual plaintiffs.[14]

### B.  Motion to Dismiss Counterclaims

#### 1.  Standards

The same standards applicable on a motion to dismiss a plaintiff's claim apply when considering a motion to dismiss a defendant's counterclaim.  *See, e.g., In re Wash. Mut., Inc. v Secs., Derivative & ERISA Litig.,* No. 08–md–1919 MJP, 2011 WL 1158387, at *3 (W.D. Wash. Mar. 25, 2011).  To survive a motion to dismiss, the counterclaim

---

[13] In its earlier order denying dismissal of the individual plaintiffs, the court relied on *Far West Fed. Bank v. Office of Thrift Supervision-Direct-OR,* 119 F.3d 1358, 1363-64 (9th Cir. 1997).  On summary judgment, it is apparent that the factual circumstances here are not in accord with *Far West.*  In *Far West,* the written agreement at issue explicitly identified the individual investors as intended beneficiaries.  *Id.* at 1364 & n.2.  In addition, there was evidence that breach of the contract would inflict injury upon the investors personally because they were induced by the defendant's promises to recapitalize the plaintiff thrift to the tune of tens of millions of dollars prior to execution of the agreement between the thrift and defendants.  Here, the individual plaintiffs are not express beneficiaries under the APA, nor have plaintiffs provided evidence of individualized injury – separate from their status as Aventa's shareholders.

[14] The court notes that although it is dismissing the claims of the individual plaintiffs on summary judgment, both Mr. Axtman and Mr. Benitez remain parties to this lawsuit as defendants to KCDL's cross-claims.  Because Mr. Axtman and Mr. Benitez are no longer plaintiffs in this matter, they now would be properly viewed as third-party defendants to KCDL's claims.  The court directs the parties to revise the caption in this matter so that it accurately reflects Mr. Axtman's and Mr. Benitez's current status in this litigation.

must have "facial plausibility [which exists] when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ---, 129 S.Ct. 1937, 1940 (2009).  In reviewing the counterclaim, the court must assume the facts to be true and construe them in the light most favorable to the nonmoving party.  *Cervantes v. United States*, 330 F.3d 1186, 187 (9th Cir. 2003).

### 2. Counterclaims One and Three – Alleged Breach of Employment Contract by Mr. Axtman and Mr. Benitez

To state a counterclaim for breach of contract, KCDL must allege that the employment contracts between itself and Mr. Axtman and Mr. Benitez, respectively, impose a duty, that the duty has been breached, and that the breach proximately caused damages to KCDL.  *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.,* 899 P.2d 6, 9 (Wash. Ct. App. 1995).  KCDL has adequately alleged that the employment contracts impose duties upon Mr. Axtman and Mr. Benitez, including (1) a duty of fidelity and loyalty to KCDL (KCDL Answer ¶¶ 14-15 (Counterclaims)), (2) a duty not to engage in any competitive business for a defined period of time (*id.* ¶ 16), (3) a duty not to interfere with KCDL's business relationships with its clients (*id.* ¶ 17), and (4) a duty to maintain all of KCDL's records and files prepared for or received from KCDL as the sole and exclusive property of KCDL, to not copy KCDL materials, and to promptly return to KCDL upon termination of their employment relationship all property belonging to KCDL (*id.* ¶ 18).

KCDL has also adequately alleged breach of the employment contracts by both men.  KCDL has alleged that both Mr. Axtman and Mr. Benitez copied and destroyed proprietary information belonging to KCDL (*id.* ¶¶ 29-30, 44), that Mr. Axtman intentionally interfered with KCDL's business relationship with a client (*id.* ¶¶ 31-32), and that Mr. Axtman's plan to launch a new company that competed with KCDL and his incorporation of that company, violated the employment contract (*id.* ¶¶ 23, 33).   KCDL has also adequately alleged damages with regard to these claims.  (*Id.* ¶¶ 34, 45.) Plaintiffs' assertions that KCDL was not damaged by these alleged breaches or that Mr. Axtman's new company never actually competed with KCDL may be arguments more appropriate for summary judgment, but they do not succeed here on a motion to dismiss. Defendants' allegations with regard to counterclaims one and three are sufficient under the applicable standards recited above.  Accordingly, the court denies Plaintiffs' motion to dismiss counterclaims one and three.

### 3.  Counterclaim Two – Alleged Breach of the Separation Agreement by Mr. Axtman

Plaintiffs assert that Defendants have failed to state a claim for breach of Mr. Axtman's separation agreement with KCDL on the basis of Mr. Axtman's copying of KCDL proprietary information following his separation from the company because the separation agreement does not prohibit the copying of documents.  (Mot. to Dismiss at 7-8.)  KCDL, however, has alleged that the contract prohibits tampering with or using KCDL proprietary information following termination of Mr. Axtman's work relationship. (*See* KCDL Answer ¶¶ 21, 36 (Counterclaims).)  Further, KCDL has alleged that the

Separation Agreement required Mr. Axtman to return all KCDL property, including copies of electronic materials (*id.* ¶22), and that, irrespective of these requirements, Mr. Axtman downloaded KCDL records onto an electronic storage device or external hard drive following his separation from the company (*id.* ¶ 25). Accordingly, KCDL has properly alleged breach of the separation agreement based on Mr. Axtman's copying of KCDL's files. The court denies Plaintiffs' motion to dismiss counterclaim two.

### 4. Counterclaim Six – Conversion

Under Washington law, the elements of conversion are an unjustified, willful interference with a chattel which deprives a person entitled to the property of possession. *Potter v. Wash. State Patrol,* 196 P.3d 691, 696 (Wash. 2008)). The plaintiff must also plead that it has some property interest in the goods allegedly converted. *Coto Settlement v. Eisenberg,* 593 F.3d 1031, 1039 (9th Cir. 2010) (citing *Meyers Way Dev. Ltd. Partnership v. Univ. Sav. Bank,* 910 p.2d 1308, 1320 (1996)). Washington courts look to the Restatement (Second) of Torts when analyzing conversion claims. *See, e.g., Brown ex rel. Richards v. Brown,* 239 P.3d 602, 611 (Wash. Ct. App. 2010) (citing and quoting the Restatement (Second) of Torts § 223 cmt. b (1965)). The Restatement recognizes claims for conversion in variety of circumstances, including wrongfully detaining chattel, destroying or altering chattel, exceeding the authorized use of chattel, and misusing chattel. *See* Restatement (Second) Torts §§ 221-241.

Plaintiffs assert that Defendants' counterclaim for conversion should be dismissed because simply accessing KCDL's files or copying them does not deprive KCDL of possession of the original electronic records remaining in KCDL's possession. (*See* Mot.

1  to Dismiss at 14.)  However, the court finds that KCDL's allegations that Mr. Axtman

2  and Mr. Benitez copied, accessed, and destroyed KCDL's electronic files constitute

3  "wrongfully detaining," "exceeding the authorized use of," or "misusing" those files,

4  thereby depriving KCDL of its possession or control over such files.  The fact that KCDL

5  has access to another copy of the files at issue does not mean that it was not deprived of

6  its possession of the copies accessed, made, or destroyed by Plaintiffs.  Further, the court

7  can find no logical basis for distinguishing between theft of copy and theft of the original

8  electronic document.  After all, the copy of the original (although allegedly created by

9  Plaintiffs) would belong to Defendants as well.  Courts dealing with this issue have

10  begun to update the tort of conversion so that it keeps pace with the contemporary

11  realities of widespread computer use.  *See, e.g., E.I. DuPont de Nemours and Co. v.*

12  *Kolon Indus., Inc.,* 688 F. Supp. 2d 443, 455 (E.D. Va. 2009) ("[Plaintiff's] claim for

13  conversion, even if based exclusively on the transfer of copies of electronic information,

14  survives [defendant's] motion to dismiss."); *Thyroff v. Nationwide Mut. Ins. Co.,* 832

15  N.Y.S.2d 873 (N.Y. 2007) ("[T]he tort of conversion must keep pace with the

16  contemporary realities of widespread computer use," and therefore, "electronic records

17  that [are] stored on a computer . . . [are] subject to a claim of conversion . . . .").  The

18  court denies Plaintiffs' motion to dismiss counterclaim six for conversion.

19  **C.  Motion for Protective Order**

20  KCDL asserts in its motion for a protective order that Mr. Axtman and Mr.

21  Benitez have waived any privilege with regard to attorney-client communications that

22  they saved onto their KCDL laptop computers.  Because this court's jurisdiction is based

ORDER- 34

on diversity[15] and the underlying claims are predicated on state law, the privilege issues are governed by state law. *See* Fed. R. Evid. 501 ("[I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a . . . person . . . shall be determined in accordance with State law."); *In re Cal. Pub. Utils. Comm'n,* 892 F.2d 778, 781 (9th Cir. 1989) ("In diversity actions, questions of privilege are controlled by state law."). Washington's attorney-client privilege applies to confidential communications and advice between an attorney and client and extends to documents that contain a privileged communication. *State v. Perrow,* 231 P.3d 853, 855 (Wash. Ct. App. 2010). In Washington, the party asserting the attorney-client privilege has the burden of proving all the elements of privilege, including the absence of waiver. *See Dietz v. Doe,* 935 P.2d 611, 618-19 (Wash. 1997); *see also Perrow,* 231 P.3d at 856. Mr. Axtman and Mr. Benitez bear the burden of proving that the attorney-client privilege attached to the communications at issue, and that they did not waive the attorney-client privilege with regard to materials that they accessed and saved on their KCDL laptop computers.

### 1. Mr. Axtman's Laptop

Washington courts have held that "[w]hen a client reveals information to a third-party, the attorney-client privilege is waived unless the third-party is necessary for the communication or has retained the attorney for a common interest." *Zink v. City of Mesa,* 256 P.3d 384, 403 (Wash. Ct. App. 2011) (citing *Morgan v. City of Fed. Way,* 213 P.3d

---

[15] KCDL removed this action from King County Superior Court to this court on the basis of diversity jurisdiction. (Am. Compl. ¶ 2.)

596, 601 (Wash. 2009)).  Following his separation from KCDL, Mr. Axtman returned his

laptop to the company in late 2009.  He did not, however, assert the attorney-client

privilege with regard to any documents contained on the laptop until May 12, 2011,

nearly a year and half following his relinquishment of the computer.  (Crooks Decl. ¶¶ 7-

8, Ex. 5.)  Once Mr. Axtman relinquished the laptop to KCDL (a third-party outside of

his attorney-client relationship) without asserting privilege or taking any precautions to

protect the privacy of materials that he had saved on the laptop, he no longer had any

reasonable expectation of confidentiality with regard to those materials.  Accordingly,

under Washington law, he waived any privilege that may have been applicable.  *See Zink,*

256 P.3d at 403; *Morgan*, 213 P.3d at 601.  Such waiver would encompass all of the

materials he placed or saved from any source onto his KCDL laptop computer.  His

belated attempt to assert the attorney-client privilege approximately a year and a half later

is futile.  Any privilege that may have existed with regard to these materials was

extinguished by his unconditional relinquishment of the laptop and cannot be

subsequently resurrected.  Accordingly, the court grants Defendants' motion with regard

to documents that Mr. Axtman saved onto his KCDL laptop computer, and that may now

be stored on either his laptop or on Defendants' servers.

### 2.  Mr. Benitez's Laptop

The court's analysis of both waiver and whether the attorney-client privileged ever

attached to certain communications or materials that Mr. Benitez saved on his KCDL

laptop stands on different grounds.  Unlike Mr. Axtman, Mr. Benitez did not relinquish

his KCDL laptop to the company without first asserting attorney-client privilege over

certain materials contained on it, and without securing a sequestration agreement with regard to those materials from KCDL. The question with regard to Mr. Benitez's assertion of privilege is whether, in light of KCDL's policies concerning the use of its laptop computers by its employees, Mr. Benitez had any reasonable expectation of privacy with regard to attorney-client communications he saved on his laptop, or whether the act of saving those communications onto his KCDL laptop served to waive any privilege that may have existed.

As discussed above, KLC performs the human resource functions for KDLC, including policy promulgation. (1st Keegan Decl. (Dkt. # 63) ¶ 2.) Although both Mr. Benitez and Mr. Axtman have denied ever being employed by KLC as opposed to KDLC (Axtman Decl. re: P.O. ¶ 5; Benitez Decl. re: P.O. ¶ 5), neither has denied KLC's human resources role with regard to KDLC. Further, although Mr. Benitez testifies that "to the best of [his] knowledge, [he] never received a copy of KLC's Employee Handbook" (Benitez Decl. re: P.O. ¶ 13), Defendants have presented evidence that Mr. Benitez received two emails dated November 19, 2007 and February 23, 2009, both of which included the KLC Handbook as an attachment. (2nd Keegan Decl. Exs. 1 & 2.) Mr. Benitez does not ever expressly deny receiving these emails. In light of Defendants' undisputed evidence of Mr. Benitez's receipt of these two emails, Mr. Benitez's best recollections that he did not receive the handbook must yield. Based on the evidence presented, the court must conclude that Mr. Benitez did in fact receive copies of the KLC Employee Handbook on more than one occasion.

In any event, Mr. Benitez was a vice-president of KCDL and a member of KCDL's executive committee. (Knowles Decl. Ex. B (Benitez Dep.) at 150:24-151:1, 151:2-19; Ex. A (Brown Dep.) at 262:8-263:12.) As a senior level manager, Mr. Benitez was "expected to know the contents of company policies so [he] could properly manage and supervise employees." (2nd Keegan Decl. ¶4.) Accordingly, Mr. Benitez is fairly charged with constructive knowledge of the company's policies concerning electronic communications. *See, e.g., Scott v. Beth Israel Med. Center, Inc.,* 847 N.Y.S.2d 436, 441 (Sup. Ct. 2007) ("[Former employee's] effort to maintain that he was unaware of [former employer's] email policy barring personal use is rejected. As an administrator, [former employee] had constructive knowledge of the policy.").

KLC's handbook contains an Electronic Communications policy which clearly states that "[e]lectronic communications are not private." (1st Keegan Decl. ¶ 3, Ex. 2.) The policy also states that "[a]ll resources used for electronic communications are KLC property" and "should generally be used only for KLC business." (*Id.*) Finally, the policy states that KLC "reserves the right to access, search, inspect, monitor, record, and disclose any file or stored communication . . . at any time and for any reason." (*Id.*)

Washington law protects only confidential communications between an attorney and a client. *Morgan,* 213 P.3d at 601 ("To qualify for attorney-client privilege, a communication must be made in confidence.") For the privilege to apply, the client must have a reasonable expectation that the communications are confidential and will be kept confidential. *In re Siegfried,* 708 P.2d 402, 404-05 (Wash. Ct. App. 1985) (analyzing psychologist-patient communications privilege which "are privileged to the same extent,

and are subject to the same conditions, as are confidential communications between attorney and client"). If a client is informed that there may be disclosure to a third-party, there is no reasonable expectation of confidentiality and the privilege never attaches. *See Hertog v. City of Seattle,* 979 P.2d 400, 411 (Wash. 1999) (analyzing psychologist-patient communications); *see also State v. Side,* 21 P.3d 321, 324-25 (Wash. Ct. App. 2001) (analyzing psychologist-patient communications, the court held that "[a] patient who is warned that communications may not be kept confidential has no reasonable expectation of confidentiality and any privilege is waived.").

Based on the company policy described above, Mr. Benitez could not have had a reasonable expectation of confidentiality with regard to communications or other materials that he created or received on his KCDL laptop following the acquisition of Aventa and that were saved or stored on his KCDL laptop or the Defendants' servers. The laptop itself was not his property, and the company reserved the right to access and disclose any file or stored communication at any time. Thus, Mr. Benitez cannot meet his burden of proving that any expectation of confidentiality he might have entertained was reasonable.[16] Accordingly, the court finds that the attorney-client privilege never

---

[16] Mr. Benitez argues that Defendants must show that he received the company policy before transferring the emails to his laptop. First, as discussed above, the burden of establishing the existence of the attorney-client privilege, including lack of waiver, is on Plaintiffs. *See Dietz,* 935 P.2d at 618-19; *see also Perrow,* 231 P.3d at 856. Second, Defendants did provide evidence of that the Employee Handbook was sent to all new Aventa employees upon commencement of employment. (*See* 1st Keegan Decl. ¶ 6, Ex. 4.) Even if Mr. Benitez received the policy after he transferred his privileged email to his laptop, upon receiving the policy and learning that his laptop was not confidential, he should have promptly taken steps to protect the privileged material. Instead, he did nothing for years and did not attempt to assert the privilege until his employment with KCDL had ended. Based on this inaction, the court finds that it would be no

attached with regard to emails or communications that Mr. Benitez created and sent or that he received after the Aventa acquisition, which were stored on his KCDL laptop or the Defendants' servers.[17]

In addition, to the extent that Mr. Benitez saved attorney-client privileged communications or documents created before the Aventa acquisition onto his KCDL laptop, he waived any privilege that may have previously attached to these materials.[18] Although Washington courts have not yet addressed this issue specifically, most state and federal courts evaluating whether an employee has waived the attorney-client privileged status of personal communications transmitted, stored, or saved onto a company computer or laptop, have applied the four-factor test initially set forth in *In re Asia Global,* 322 B.R. 247, 257 (Bankr. S.D.N.Y. 2005). *See In re Reserve Fund Sec. & Derivative Litig.,* 275 F.R.D. 154, 159-60 (S.D.N.Y. 2011) (describing *Asia Global* as "widely adopted" and listing myriad cases). The *Asia Global* factors are: (1) does the company maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or email, (3) do third parties have a

---

defense to waiver even if Mr. Benitez had not receive the policy until after he had transferred confidential communications to his laptop.

[17] Although the court previously held that Mr. Axtman waived any applicable privilege when he unconditionally relinquished his laptop to KCDL following his separation from the company, the court's analysis here concerning Mr. Benitez would also apply to Mr. Axtman as additional grounds for granting Defendants' motion for a protective order.

[18] Although the court has already found that privilege did not attach to files or communications that Mr. Benitez created or received on KCDL laptop following the acquisition of Aventa, this waiver analysis would also apply to these files or communications as an additional ground for granting Defendants' motion.

right of access to the computer or emails, and (4) did the corporation notify the employee, or was the employee aware, of the policy. *Asia Global,* 322 B.R. at 257.

With regard to the first factor, the company's policy states that "resources used for electronic communications . . . should generally be used only for KLC business." (1st Keegan Decl. ¶ 3, Ex. 2 at 21.) Although the company policy does not place an outright ban on any personal use, personal use is discouraged. Further, the policy expressly warns employees that electronic communications are not private. Consequently, it would not be reasonable for an employee to believe that such communications stored on company hardware would be confidential. With regard to the second factor, not only does the company policy expressly state that any stored communication or file can be monitored, recorded and disclosed, the company does in fact conduct such monitoring. (1st Keegan Decl. ¶ 5.) Although there is no evidence that KCDL ever specifically monitored Mr. Benitez's computer during his employment, courts have found that a policy permitting such monitoring meets this factor. *See, e.g., Scott,* 847 N.Y.S.2d at 442. For the third factor, the policy expressly allows the company to access information and to disclose it. Finally, the court has previously addressed the fourth factor and found that Mr. Benitez had both actual and constructive notice of the company's policies. Accordingly, the *Asia Global* factors have been met, and the court concludes that Mr. Benitez waived any

privilege that may have attached to the communications or files at issue here when he saved or stored them on his KCDL laptop computer.[19]

Some courts have found an exception maintaining an employee's expectation of privacy at least with regard to attorney-client communications accessed on personal, password-protected, web-based email – even if the employee accesses the web-based account using the company's computer system and the company maintains a policy against such use. *See, e.g., Stengart v. Loving Care Agency, Inc.,* 990 A.2d 650, 665 (N.J. 2010) ("Because of the important public policy concerns underlying the attorney-client privilege, even . . . a policy that banned all personal computer use and provided unambiguous notice that an employer could retrieve and read an employee's attorney-client communications, if accessed on a personal, password-protected e-mail account using the company's computer system – would not be enforceable."). In particular, Mr. Benitez and Mr. Axtman rely upon *Sims v. Lakeside School,* No. C06-1412RSM, 2007 WL 2745367 (W.D. Wash. Sept. 20, 2007). In *Sims,* the court found that, based on the school/employer's policy, the employee had no reasonable expectation of privacy in the contents of his laptop, and that his absence of privacy rights also extended to the emails he sent and received on the school's accounts. *Id.* at *1. The court, nevertheless, held to the contrary with regard to web-based emails sent and received by the plaintiff on his school laptop. *Id.* at *2. The *Sims* court does not provide a rationale for its distinction

---

[19] Although the court previously found that Mr. Axtman waived any privilege when he unconditionally relinquished his laptop to KCDL, the court's waiver analysis with regard to Mr. Benitez under the *Asia Global* factors would be equally applicable to Mr. Axtman, and provides additional grounds for finding waiver of the privilege in his case.

other than general public policy grounds and the importance of the attorney-client privilege. *Id.*

Although this court is in accord with regard to the value of the attorney-client privilege, it does believe that *Sims* is applicable here. The *Sims* court does not specifically address choice of law, but it appears to have based its analysis on federal law. *See id.* Here, the court's analysis must be grounded in and consistent with its view of Washington law. Washington has a policy of "strictly limiting the attorney-client privilege to its purpose." *Sitterson v. Evergreen Sch. Dist. No. 114,* 196 P.3d 735, 741 (Wash. Ct. App. 2008). In *Sitterson*, the court was considering whether to adopt an approach to inadvertent production of the attorney-client communications which (1) never waived the privilege, or (2) which considered the circumstances of the case. *Id.* at 740-42. The *Sitterson* court found that a non-waiver rule "is inconsistent with Washington's policy." *Id.* at 741. The court stated:

> The privilege is so limited because it sometimes results in the exclusion of relevant and material evidence, contrary to the philosophy that justice requires the fullest disclosure of the facts. . . . Consequently, employing the attorney-client privilege to prohibit testimony must be balanced against the benefits to the administration of justice stemming from the general duty to give what testimony one is capable of giving. . . . These considerations weigh toward taking a broader view of waiver than the [defendant] proposes.

*Id.* (citations and quotations omitted). As a result, the court rejected a rule in which inadvertent disclosure could never waive the attorney-client privilege. Instead, the court adopted a "balanced approach," in which the court considered a variety factors

surrounding the inadvertent disclosure in determining whether waiver had occurred. *Id.* at 741-42.

Following *Sitterson*, this court believes that Washington would also take a broader view of the waiver issue here, and adopt a balanced approach and not a non-waiver rule concerning web-based personal email accounts that are accessed through an employee's company computer or laptop. Accordingly, the court does not believe that decisions such as *Stengart* or *Sims*, which adopt a no-waiver rule concerning web-based personal email accounts accessed through an employee's company-issued computer or laptop, are applicable in Washington. Applying the balanced-approach outlined in *Asia Global*, the court can find no reason to distinguish between emails that were sent from or received on the company's email system and emails that were accessed through the company's laptop on Mr. Benitez's or Mr. Axtman's web-based email accounts. The company's policy here was broad. It applied to "[a]ll resources used for electronic communications" and stated that these resources were KLC property. (1st Keegan Decl. ¶3, Ex. 2.) Further, the policy reserved the company's right "to access, search, . . . or disclose *any file or stored communication*." (*Id.* (italics added).) To the extent that Mr. Benitez's or Mr. Axtman's emails from their web-based personal email accounts are stored on their KCDL laptops or the Defendants' servers, those emails would be encompassed by the policy. Accordingly, based on the *Asia Global* factors analyzed above, any privilege that once may have applied to these communications is waived.

# IV.    CONCLUSION

Based on the forgoing, the court GRANTS in part and DENIES in part Defendants' motion for summary judgment (Dkt. # 81), DENIES Plaintiffs' motion to dismiss the counterclaims (Dkt. # 58), and GRANTS Defendants' motion for a protective order (Dkt. # 61).

Dated this 8th day of November, 2011.


_____
JAMES L. ROBART
United States District Judge